**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHWESTERN DIVISION**

| | |
|---|---|
| **CHELSEA GENTRY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:16-cv-1466-LCB** |
| ) | |
| **THE CITY OF RUSSELLVILLE,** ) | |
| **ALABAMA,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Chelsea Gentry alleges discrimination and retaliation under Title VII, 42 U.S.C. § 2000e, and under 42 U.S.C. § 1983, against Defendant City of Russellville, Alabama. (Doc. 1, No. 3:16-cv-01466 and Doc. 1, No. 3:17-cv-01127). Plaintiff also asserts a wage and hour claim under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207. (Doc. 1, No. 3:17-cv-01127). This matter is before the Court on Defendant's motion for summary judgment. (Doc. 32). For the reasons set forth below, the Court shall grant Defendant's motion.

## I. STANDARD FOR MOTION FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine

dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When considering a defendant's motion for summary judgment, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the plaintiff. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). Accordingly, the Court presents the facts in this opinion in the light most favorable to Plaintiff. *See also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("[W]hen conflicts arise between the facts evidenced by the parties, [courts] must credit the nonmoving party's version."). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.    STATEMENT OF FACTS

Plaintiff began her employment with the Russellville Police Department (RPD) in December 2011, at the age of 21. (Doc. 28-1 at 12). Plaintiff has a bachelor's degree in criminal justice. (*Id.* at 6). She attended the police academy in January 2012. (*Id.* at 12).

Plaintiff worked as a police officer during the first three years of her employment. (*Id.* at 12, 17). Between October 2012 to September 2013, the RPD disciplined Plaintiff due to some problems, but on December 2, 2014, the RPD gave Plaintiff a good annual review. (Doc. 28-1 at 70-71; Doc. 28-4 at 11; Doc. 28-5 at 11-12; Doc. 39-13).

In the summer of 2015, Defendant's Civil Service Board (CSB) posted a sergeant position at the RPD. (Doc. 28-1 at 17; Doc. 28-4 at 6). The RPD instructed officers to sign their name to a list if they were interested in applying for the position. (Doc. 28-4 at 6). Plaintiff was the only officer who signed the list. (Doc. 28-1 at 18). Despite reservations based on her prior work history, Chief Hargett recommended Plaintiff to the CSB for promotion. (Doc. 28-4 at 6, 10-11). In August 2015, the CSB promoted Plaintiff to sergeant and gave her a pay raise. (Doc. 39-65; Doc. 28-7, ¶ 4). The CSB has a policy that newly promoted employees are placed on a six-month probation. (Doc. 28-1 at 31-32, 72; Doc. 28-4 at 13; Doc. 28-5 at 22-23).[1]

Upon her promotion, Chief Hargett and Cpt. Prince told Plaintiff that RPD would assign her to a field training officer and she would undergo a supervisor field training program. (Doc. 28-1 at 18-19). The RPD did not have a written

---

[1] Plaintiff testified that she was told she would be placed on a one-year probation, instead of six months, which is not disputed by Chief Hargett and Cpt. Prince. (Doc. 28-1 at 31-32, 72; Doc. 28-5 at 22-23; Doc. 28-4 at 13). Regardless, Plaintiff was demoted within two and half months of being a sergeant. (Doc. 28-1 at 31-32).

policy for a training program until October 29, 2015.  (Doc. 28-4 at 16).  Plaintiff was the first participant in the program.  (*Id.* at 11).  Over the course of Plaintiff's participation, the RPD made changes to the program because the program was still being developed.  (Doc. 28-1 at 18; Doc. 28-7, ¶ 4).

Initially, the RPD paired Plaintiff with Sgt. Miller.  (Doc. 28-1 at 19).  Sgt. Miller evaluated Plaintiff stating that she failed to exhibit command presence, failed to demonstrate an ability to control situations when responding to calls, had difficulty organizing officers and distributing calls for service, appeared to lose track of service calls and whereabouts of her officers, and appeared to be unfamiliar with certain department policies and procedures.  (*Id.* at 19-20, 120). [2] Sgt. Miller also noted that Plaintiff was not receptive to feedback, sleeps during shifts, is insubordinate, and overall has leadership and professional weaknesses.  (*Id.* at 123-24).  Subsequently, Sgt. Franks evaluated Plaintiff, remarking that Plaintiff had displayed poor leadership skills, poor professionalism, poor knowledge of general orders, and appeared to be sleeping in her patrol car.  (*Id.* at 121-22).

Plaintiff admitted to occasionally sleeping during a shift.  (*Id.* at 21-22).  She also testified that she questioned the qualifications of the training officers

---

[2] Plaintiff was not given an "Advance with GPS" even though she asked for one. (Doc. 28-1 at 33, 71).

assigned to her. (*Id.* at 20-21). Plaintiff admitted defending or justifying her actions when receiving criticism from her supervisors. (*Id.*).

Sgts. Miller and Franks recommended that Plaintiff not continue as sergeant (Doc 28-1 at 121-24). On October 29, 2015, Chief Hargett demoted Plaintiff to patrol officer after reviewing her evaluations and speaking to Sgts. Miller and Franks and Cpt. Prince. (Doc. 28-1 at 27; Doc. 28-7, ¶ 5; Doc. 28-5 at 26; Doc. 39-22).

At the time of Plaintiff's demotion, Mickey Gentry, Plaintiff's husband, served as a volunteer reserve officer at the police department. (Doc. 28-7, ¶ 9). Since 2004, Defendant had also employed Mr. Gentry as a firefighter. (Doc. 28-3 at 16). Mr. Gentry went to Mayor Grissom to discuss his wife's demotion. (Doc. 28-1 at 41, 78). Among other things, Mr. Gentry told the mayor that Chief Hargett demoted Plaintiff because Plaintiff was not one of Chief Hargett's "drinking buddies." (Doc. 28-3 at 9, 23-26).

Chief Hargett removed Mr. Gentry from the reserve officer program and told him not to come to the police station. (Doc. 28-7, ¶ 9). Cpt. Prince told Plaintiff that Mr. Gentry was not allowed at the police station. (Doc. 39-83, recording).[3] After the RPD demoted Plaintiff, the RPD placed Plaintiff into the

---

[3] Plaintiff labeled this recording as PX-71 on the disc submitted to the Court, but incorrectly labeled the recording as PX-72 in her conventional filing. (Doc. 39-83).

position of a patrol officer. (Doc. 28-1 at 131). On November 1, 2015, Plaintiff appealed her demotion to the CSB. (Doc. 28-1 at 79; Doc. 39-27). On November 4, 2015, Plaintiff filed a charge of discrimination with the EEOC. (Doc. 28-1 at 80; Doc. 39-28).[4]

On December 14, 2015, Cpt. Prince reviewed Plaintiff's performance, noting that her job knowledge was "average considering her years of experience," she does not take constructive criticism well or follow directions, and she "tends to maximize any opportunity to use her sick leave." (Doc. 39-34). On December 15, 2015, Lt. Shackelford reviewed Plaintiff's performance, confirming many of Cpt. Prince's statements. (Doc. 39-35). For example, Lt. Shackelford stated that Plaintiff was not dependable and that he "was in full support of [Plaintiff's] removal [as sergeant], and I still stand beside that decision." (*Id.*).

In late January 2016, Plaintiff informed Chief Hargett that she was pregnant and requested that he keep the information private. (Doc. 28-1 at 83).

On March 5, 2016, during the night shift, Sgt. Franks observed Plaintiff sitting in her patrol vehicle in the police station parking lot. (*Id.* at 132-33). Sgt. Franks believed Plaintiff was sleeping and took a picture of her. (*Id.* at 134,

---

[4] On December 7, 2015, Plaintiff wrote the City Council, requesting that she be reinstated as sergeant. (Doc. 39-2 at 40; Doc. 39-30; Doc. 39-80 at 28). At that time, Plaintiff still held the position of sergeant because the City Council had not officially demoted her. (Doc. 39-99). On December 7, 2015, the City Council demoted Plaintiff. (Doc. 39-2 at 1, Doc. 39-33). On December 11, 2015, Plaintiff appealed the CSB's decision to demote her. (Doc. 39-3 at 1; Doc. 39-33). On March 8, 2016, the CSB ruled Plaintiff did not have the right to appeal the demotion. (Doc. 39-3 at 3; Doc. 39-61).

photograph).  Plaintiff testified that she was not asleep, but she does not dispute that Sgt. Franks believed she was asleep.  (*Id.* at 22, 35-36).

On March 7, 2016, Mr. Gentry and Plaintiff went to the police station to speak to Chief Hargett about Sgt. Franks.  (Doc. 28-1 at 36-37, 41).  The RPD's General Order No. 100 I. (O.) provides that employees are required to follow the chain command to report department related issues unless an employee has a complaint of sexual harassment.  (Doc. 28-1 at 135-36, 141; Doc. 28-7, ¶ 10).  Plaintiff testified that she was not reporting sexual harassment.  (Doc. 28-1 at 40).

On March 10, 2016, Plaintiff interviewed for another sergeant position.  (*Id.* at 84).  That same day, Chief Hargett suspended Plaintiff for five days without pay for sleeping on duty and an additional five days without pay for bypassing the chain of command.  (Doc. 39-39).[5]

Plaintiff gave Chief Hargett a note from her doctor, dated March 21, 2016, requesting that she be placed in the office, preferably on a day shift.  (Doc. 39-43).  Chief Hargett requested clarification from Plaintiff's physician as to the extent of her medical limitations, which he received on April 1, 2016. (Doc. 28-2 at 35; Doc. 28-4 at 24, 39, 42).  The physician's note stated that Plaintiff could not wear her

---

[5] On March 10, 2016, Ms. Gentry requested an appeal of this action to the CSB. (Doc. 39-41). On March 28, 2016, the CSB notified Chief Hargett and Plaintiff that her hearing was set for April 14, 2016. (Doc. 39-46).

utility belt,[6] and she could not be on the street because of a risk of being hit in the abdomen. (Doc. 28-4 at 42).

On March 24, 2016, Plaintiff filed a second charge of discrimination with the EEOC. (Doc. 39-9 at 8).

The RPD did not have a "light duty" position. (Doc. 28-1 at 88). Therefore, the RPD placed Plaintiff on a medical leave and required her to use sick or personal leave to take time off. (Doc. 28-1 at 88; Doc. 28-4 at 39; Doc. 28-8 at 7). Plaintiff could request leave donations from other employees if she exhausted her own leave time. (Doc. 28-8 at 7). Several Fire Department employees donated sick leave time to Plaintiff. (Doc. 28-1 at 63). No RPD employees donated time to Plaintiff, despite her requests to RPD employees for donated time. (*Id.* at 65).

During her medical leave, the RPD offered Plaintiff dispatch shifts when available so she would not have to use her own leave time or donated leave time. (Doc. 28-1 at 42-43; Doc. 28-4, at 40). On June 18, 2016, while Plaintiff was working a dispatch shift, Mr. Gentry came to the police station and went inside the dispatch room with Plaintiff. (Doc. 28-1 at 42-43). Lt. Shackelford observed the incident and reported it to Cpt. Prince. (Doc. 28-4 at 27; Doc. 28-5 at 19). Plaintiff was suspended for 14 days without pay. (Doc. 28-1 at 44-45).

---

[6] All patrol officers are required to wear a duty belt. (Doc. 28-4 at 40). The duty belt includes the officer's firearm, extra magazines, handcuffs, and other necessary items. (*Id.*).

In September 2016, Plaintiff's child was born. (*Id.* at 6, 94). On October 12, 2016, the RPD disciplined Plaintiff for taking her sick leave donation forms to City Hall, rather than turning them in to Chief Hargett. (Doc. 28-1 at 45, 95; Doc. 39-52; Doc. 39-53). On November 4, 2016, Plaintiff filed a third charge of discrimination with the EEOC related to her demotion. (Doc. 39-8 at 12).

On November 7, 2016, Plaintiff returned to full-time duty. (Doc. 28-1 at 95). Plaintiff told Cpt. Prince that she needed to pump breast milk for her child. (*Id.*). The RPD told Plaintiff she could use the break room or go home during breaks to pump breast milk. (*Id.* at 50). Plaintiff chose to go home during her paid breaks. (*Id.*). The RPD required Plaintiff to remain on duty while traveling home until she went out of her service area, at which time she was required to call or text. (*Id.*).

The RPD instructed Plaintiff to make up extra time at the end of her shift because her breaks took longer than the allotted hour and Plaintiff sometimes arrived at work late. (Doc. 28-4 at 30; Doc. 39-55). On December 12 and 27, 2016, the RPD counseled Plaintiff and gave her a written directive regarding her breaks, but the RPD did not discipline her. (Doc. 28-1 at 82, 96; Doc. 28-2 at 51; Doc. 28-5 at 21-22; Doc. 39-55; Doc. 39-56).

At some point, Plaintiff's physician instructed her to breastfeed her baby instead of pumping milk. (Doc. 28-1 at 49-50, 97; Doc. 39-84, recording).[7] Plaintiff worked a 12-hour shift and needed three breastfeeding breaks, which were about 20 minutes each. (Doc. 39-84, recording).

Around this time, a shooting occurred in Russellville, Alabama, during which the suspect was injured and required medical care. (Doc. 28-1 at 47). The RPD transported the suspect to Huntsville Hospital in Huntsville, Alabama. (Doc. 28-4 at 32). The RPD scheduled Plaintiff to guard the suspect at the hospital in Huntsville. (*Id.*) Plaintiff raised concerns about breastfeeding while guarding the suspect. (Doc. 28-1 at 47). The RPD told Plaintiff to take her concerns up the chain of command, which she did. (*Id.*). The RPD rearranged the schedule and reassigned Plaintiff that day. (*Id.*). The RPD scheduled Plaintiff for a night shift that evening in Russellville. (Doc. 28-1 at 97-99; Doc. 28-4 at 33-34).

A few weeks later, Cpt. Prince made a schedule change and reassigned some officers, including Plaintiff to the night shift. (Doc. 28-5 at 27; Doc. 28-1 at 46; Doc. 30, Ex. L, recording). Plaintiff complained to her lieutenant and then to Cpt. Prince about the schedule change. (Doc. 30, Ex. L, recording). Cpt. Prince told her it was a temporary assignment until the new sergeants gained experience. (Doc. 28-1 at 49; Doc. 30, Ex. L, recording). Plaintiff submitted a written request

---

[7] Although the dates of certain events provided by the parties are undisputed, the Court was unable to find evidence supporting the dates in the citations provided.

to speak to the City Council instead of taking her complaints to Chief Hargett. (Doc. 28-1 at 46, 52).  Plaintiff did not tell anyone that she had requested to speak to the City Council.  (*Id*. at 52).

The City Council held a regularly scheduled meeting, and at Plaintiff's request, the City Council spoke to her in a private executive session.  (Doc. 28-4 at 30).  Plaintiff hoped the City Council would "step in and just tell my supervisors to back off a little bit and just let me do my job." (Doc. 28-1 at 46).  Plaintiff spoke to the City Council about the assignment to guard the suspect at Huntsville Hospital. (*Id.* at 47-48).  The City Council questioned Chief Hargett about this matter and others issues related to Plaintiff.  (Doc. 28-4 at 30).  Based on the questions, Chief Hargett understood that Plaintiff had led the City Council to believe that the RPD required Plaintiff to travel to Huntsville to guard a suspect.  (Doc. 28-4 at 30, 32, 34; Doc. 28-6 at 4).  The next working day, the RPD placed Plaintiff on paid administrative leave. (Doc. 28-1 at 55; Doc. 28-4 at 32, 34).

The following day, the RPD instructed Plaintiff to come to the station with her police equipment.  (Doc. 28-1 at 56; Doc. 28-4 at 34).  Plaintiff testified that she thought the RPD would terminate her employment and spoke to her father, who was with her at the time in Birmingham, about her anticipated termination.

(Doc. 28-1 at 56).[8]   When Plaintiff arrived, Chief Hargett told her that she had violated the chain of command and could resign or be terminated.  (Doc. 28-1 at 57-58; Doc. 28-4 at 32, 35; Doc. 39-79, recording).   Plaintiff opted to resign. (Doc. 28-1 at 60-61).  She asked if she should go home to write her resignation letter.  (*Id.* at 58).  Chief Hargett told her she could use the computer that was in their room.  (*Id.*).  She did not request additional time to consider her decision. (*Id.*).

On April 27, 2017, Plaintiff filed a third charge of discrimination with the EEOC.  (Doc. 39-59).

On September 6, 2016, Plaintiff filed this lawsuit --- (Doc. 1, No. 3:16-cv-01466-MHH),[9] --- and on July 4, 2017, Plaintiff filed a second lawsuit ---  (Doc. 1,  No. 3:17-cv-01127-AKK).[10]   On November 30, 2017, another judge on this Court consolidated these two cases under case number 3:16-cv-01466.  (Doc. 21).[11]

---

[8] With travel time and other errands, over two hours elapsed between the call from the RPD and Plaintiff arriving at the police station.  (Doc. 28-1 at 56).

[9] Count I alleges a hostile work environment and a discriminatory demotion in violation of Title VII, 42 U.S.C. § 2000e.  (Doc. 1, No. 3:16-cv-01466, ¶¶ 13-17).

[10] Counts I and II allege retaliation and discriminatory discharge, respectively, in violation of Title VII.  (Doc. 1, No. 3:17-cv-01127, ¶¶ 141-51).  Count III alleges a violation of the FLSA related to breastfeeding her child.  (*Id.*, ¶¶ 152-58).  Counts IV and V allege disparate treatment and a hostile work environment, respectively, in violation of 42 U.S.C. § 1983.  (*Id.*, ¶¶ 159-69).

[11] On October 26, 2018, this case was reassigned to the undersigned judge.  (Doc. 47).

## III.  ANALYSIS

## A.  Retaliation Claim

Plaintiff alleges that Defendant retaliated against her in violation of Title VII. (Doc. 1 at 18-21, ¶¶ 141-45, No. 3:17-cv-01127).[12]  The burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), applies to Plaintiff's retaliation claim because she has not put forth direct evidence of retaliation.  Under *McDonnell Douglas*, Plaintiff first must establish a prima facie case of retaliation.  *Id.*  If she is able to establish a prima facie case of retaliation, then the burden shifts to Defendant to produce a legitimate, nonretaliatory reason for the action.  *Id.*  Once Defendant meets its burden, then Plaintiff must show that the proffered reason is a pretext for retaliation.  *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016).

To establish a prima facie case for retaliation, a plaintiff must show that: (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was a causal connection between the protected activity and the materially adverse action.  *Howard v. Walgreen Co.,* 605 F.3d 1239, 1244 (11th Cir. 2010).

---

[12] In her brief, Plaintiff titles her argument as "RETALIATION 42 USC 2000(e) AND 1983 (EP)."  (Doc. 52 at 38).  However, Plaintiff has not alleged a retaliation claim under 42 U.S.C. § 1983.  (*See* Doc. 1, Nos. 3:17-cv-01127, 3:16-cv-01466).

As to the first element, Defendant does not dispute that Plaintiff's filing of three EEOC charges and two lawsuits constitute statutorily protected activity. (Doc. 50, p. 35).[13] Accordingly, the Court proceeds with its analysis of the other factors under the burden-shifting framework.

Under the next prong of the prima facie case, Plaintiff alleges that she suffered 13 different materially adverse actions:

> [1] [Plaintiff's] husband was banned from the premises and taken out of reserves, [2] she was not given the right to appeal her demotion contrary to policy, [3] her co-workers were told not to associate with her, [4] she was followed and verbally harassed and told she was disgruntled and she needed to quit, [5] she was written up on March 10, 2015 wherein she was docked 5 days' pay for sleeping and 5 more days for her complaint of disparate treatment/harassment to the chief, [ 6 ] her doctor's excuse was refused, [7] she was not donated hours by anyone in her department, [8] she was only given half of the hours donated to her, [9] she was written up for pump/breastfeeding breaks, [10] she was written up and docked 14 days' pay because her husband came to the department to bring her lunch, [11] she was written up just three days later because her husband did not come to the department to turn in forms, [12] she was not promoted to Sergeant, and [13] she was involuntarily terminated.

(Doc. 52 at 39-40) (citations omitted). With respect to these actions, the Court considers each of the alleged adverse actions in turn.

---

[13] Plaintiff not only asserts her filing of EEOC charges and lawsuits as statutorily protected activity, but she also asserts additional acts of statutorily protected activity: "Gentry's husband went to the Mayor and threatened a lawsuit on October 29, 2015, Gentry wrote the Civil Service Board alleging 'discrimination and harassment' on November 1, 2015, . . . Gentry wrote the Civil Service Board alleging she was 'gender/sexually discriminated and harassed' by her supervisors on December 11, 2015, [and Plaintiff] verbally complained to Chief of Sgt. Franks harassment on March 7, 2016." (Doc. 52 at 38) (citations omitted). Defendant does not contest these additional acts of "statutorily protected activity." (See Doc. 53).

1.    Mr. Gentry's ban from police station and removal from reserves

Plaintiff argues that Mr. Gentry's ban from the police station and removal from officer reserves was "*because* of [Mr. Gentry's] discussion with the Mayor threatening a lawsuit." (Doc. 52 at 40). Defendant's argument focuses on Plaintiff not having engaged in a statutorily protected activity yet because Mr. Gentry's accusations occurred "the very day [Plaintiff] was demoted." (Doc. 53 at 8). However, Plaintiff's argument of a statutorily protected activity concerns Mr. Gentry's alleged threat of a lawsuit to the mayor.

First, Plaintiff cites a recording to support her statement that Mr. Gentry threatened a lawsuit when talking to the mayor. (*See* Doc. 39-83). However, this recording does not support her assertion that Mr. Gentry actually threatened a lawsuit. (*Id.*). Second, Plaintiff generally cites to *Thompson v. North American Stainless*, *LP,* 562 U.S. 170 (2011) without any discussion. In *Thompson,* the defendant fired the plaintiff three weeks after his fiancée, who was also an employee of the defendant, filed an EEOC charge alleging sex discrimination. The plaintiff in *Thompson* then filed an EEOC charge based on retaliation. *Id.* at 172. The facts in *Thompson* are clearly distinguishable from the facts in the instant case. Thus, the Court finds that Plaintiff's reliance on *Thompson* is misplaced, and *Thompson* is inapplicable. Accordingly, the Court finds that Plaintiff has not established a prima facie case.

Assuming, *arguendo*, that Plaintiff could establish a prima facie case, Defendant has asserted a legitimate, nonretaliatory reason for restricting access, *i.e.*, Chief Hargett had "discretion as police chief to restrict access to the police station due to [Mr. Gentry's] baseless accusation." (Doc. 53 at 8).

During Mr. Gentry's conversation with Mayor Grissom, Mr. Gentry told the mayor that one of the reasons Plaintiff was demoted was because she was not one of Chief Hargett's "drinking buddies." (Doc. 28-3 at 24).[14] Chief Hargett attested that "[w]hen [Mr.] Gentry told [] Mayor David Grissom that I demoted Ms. Gentry because she was not one of my 'drinking buddies,' I decided that Mr. Gentry could no longer serve as a reserve officer and was not welcome at the police station. I instructed him not to come down to the police station for any reason. I did not discipline Plaintiff in any way for her husband's statements." (Doc. 28-7, ¶ 9). Plaintiff has not shown that her husband's ban and removal from officer reserves was a pretext for retaliating against her.[15] Thus, Defendant is entitled to summary judgment on this claim.

---

[14] Mr. Gentry testified that after meeting with Mayor Grissom, Mr. Gentry accessed the supervisor field training policy by virtue of his position as a reserve officer. (Doc. 28-3 at 23-24). Mr. Gentry then went back to Mayor Grissom a second time that same day to discuss the policy. (*Id.* at 24).

[15] It is undisputed that "[r]eserve officers are volunteers who serve at the pleasure of the police chief." (Doc. 28-7, ¶ 9).

## 2.   Right to appeal demotion

Plaintiff asserts that "she was not given the right to appeal her demotion contrary to policy" (Doc. 52 at 39), and that "[a]ny permanent employee, which [she] was, can appeal disciplinary decisions, and demotion is disciplinary." (*Id.* at 42-43). Defendant argues that pursuant to City policy, "only permanent (*i.e.*, not probationary) employees are permitted to appeal demotions" and Plaintiff was not a permanent employee. (Doc. 53 at 9). In other words, Defendant argues that it had a legitimate, nonretaliatory reason for not allowing Plaintiff to appeal her demotion.

City policy grants a permanent employee "the right to appeal any disciplinary action . . . ." (Doc. 39-38, Rule X – Rights of Review and Appeal). Plaintiff acknowledges that she was on "promotional probation" when she became a sergeant. (Doc. 28-1 at 104). Thus, Plaintiff was not a permanent employee with respect to the sergeant position. Defendant argues that Plaintiff "has presented no evidence to invalidate the City's showing that she was not permitted to appeal her demotion due to her probationary status." (Doc. 53 at 9). With no other factual support or authority, Plaintiff has failed to show that that the City's reason for not allowing her to appeal her demotion was a pretext for retaliation. Accordingly, summary judgment is granted on this claim.

### 3. Associating with co-workers

Plaintiff asserts that she suffered an adverse action when "her co-workers were told not to associate with her." (Doc. 52 at 39). Plaintiff does not discuss the action or provide any evidence in support thereof. Plaintiff testified that when she and her husband had a conversation with Officer Brett Evans about not returning phone calls or texts, he responded that he was "told just to kind of keep my distance from you, that I – until all your stuff is over, I can't really talk to you." (Doc. 28-1 at 66). Mr. Gentry also testified that Officer Evans told him he was "no longer allowed to talk to us" and that he did not want to lose his job. (Doc. 28-3 at 11).[16] However, Officer Evans did not tell Plaintiff or her husband who told him to keep his distance. (Doc. 28-1 at 67). Plaintiff does not demonstrate who told her co-workers not to associate with her. Plaintiff fails to show an adverse action and thus cannot establish a prima facie case. Accordingly, the Court grants summary judgment on this issue.

### 4. Harassing behavior

Plaintiff asserts that she suffered an adverse action when she was "followed" and "verbally harassed." (Doc. 52 at 39). Specifically, Plaintiff states, "Supervisor

---

[16] Mr. Gentry's testimony recounts a number of text messages he sent to Officer Evans but went unanswered, as well as a Facebook message Mr. Gentry sent to Officer's Evans's wife, stating "Congratulations to you, and thank you for not blocking me or staying friends with us. [Officer Evans] won't even talk to us now, after all . . . we're the only ones that encouraged him . . . and stuck up for him when everybody else in the department is talking badly of him. And now he's one of them." (Doc. 28-3 at 13).

Franks told [her] she was disgruntled and needed to quit,[17] and when [she] told [Officer] Shackelford she could not watch an inmate and breastfeed, he told her she needed to quit again." (*Id.* at 42). Plaintiff's only argument is that Sgt. Franks and Lt. Shackelford were supervisors telling her to quit based on "gender based issues." (Doc. 52 at 42). With no evidence or authority, Plaintiff fails to establish the elements of a prima facie case based on this single statement.

Even if Plaintiff could establish a prima facie case, Defendant asserts that Sgt. Franks's actions in monitoring Plaintiff's whereabouts and activities were legitimate and nonretaliatory because his actions were consistent with his job duties. (Doc. 53 at 11). Sgt. Franks was Plaintiff's supervisor and thus was responsible for keeping track of her, as well as other officers under his supervision. (Doc. 28-1 at 37). Plaintiff agreed that she had a GPS for that purpose and had no evidence of how much supervision was being given to other officers. (*Id.* at 37-38). Plaintiff's questioning of how Sgt. Franks could be doing his job properly if he was constantly following her around does not establish pretext. (Doc. 28-1 at 37). Plaintiff does not show that Defendant's reason was a pretext for retaliation. Accordingly, summary judgment is granted on this claim.

---

[17] Apparently, this comment was made by Sgt. Franks after he took a picture of Plaintiff allegedly asleep in her car while on duty. (Doc. 28-1 at 38).

5. <u>Docked pay for sleeping and violating chain of command</u>

a. *Sleeping incident*

Plaintiff asserts that "she was written up on March 10, 2015, wherein she was docked 5 days' pay for sleeping" in her patrol car on March 5, 2016. (Doc. 52 at 40; Doc. 39-39). Defendant does not address whether the plaintiff has established a prima facie case. Accordingly, for purposes of this motion, the Court will assume that Plaintiff has satisfied her burden. Defendant asserts it had a legitimate, nonretaliatory reason for Plaintiff's discipline.

The RPD's Rule of Conduct 100, IV(C)(i)(d) states that "sleeping on duty" is considered a serious violation. (Doc. 28-1 at 138). Plaintiff argues that she was not asleep, but that Sgt. Franks "thought that I was sleeping." (*Id.* at 35).[18] This statement does not establish that Defendant's reason for disciplining Plaintiff was a pretext for retaliation. *See Williams v. Fla. Atl. Univ.,* 728 F. App'x. 996, 999 (11th Cir. 2018) (holding that "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable

---

[18] Sgt. Franks found Plaintiff sitting in her patrol car for a significant period of time in the RPD parking lot. (Doc. 28-1 at 35). Plaintiff testified that she had been working on her computer and laid her head back because she had a migraine. When Sgt. Franks saw Plaintiff, he took a picture of her. (*Id.* at 35, 134). Plaintiff agreed that in the picture her eyes were closed, her mouth is slightly open, and her head is tilted back. (*Id.* at 134). Furthermore, Plaintiff testified that during her training, she did lay her head back and fall asleep "a few times" and that Sgt. Miller told her sleeping in her patrol car was not permissible. (*Id.* at 21-22).

for discriminatory conduct") (quoting *Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1363, n.3 (11th Cir. 1999)).

Plaintiff also argues that "the Chief made it clear [sleeping] is okay for safety purposes and admitted *everyone* does it." (Doc. 51 at 42).[19] The Plaintiff offers a photograph of Lt. Shackelford sleeping inside the police station. (Doc. 39-18).[20] Plaintiff does not discuss or provide the context of this photograph. Furthermore, Plaintiff has failed to produce evidence of officers sleeping in their patrol cars, as she was, *and* Chief Hargett being aware of these incidents. (*See* Doc. 28-4 at 38). Plaintiff has not been able to show that Defendant's reason for disciplining her in this instance was a pretext for retaliation. Thus, summary judgment is granted on this issue.

### b. *Violating chain of command*

Plaintiff asserts that she was suspended without pay for five days because she complained to Chief Hargett about Sgt. Franks's alleged harassment. Defendant argues that Plaintiff violated the chain of command by taking her complaints about Sgt. Franks straight to the Chief. Thus, Defendant asserts it had a legitimate, nonretaliatory reason for suspending Plaintiff. Defendant does not

---

[19] Plaintiff testified that Sgt. Miller explained to her that sleeping in her patrol car was unacceptable. (Doc. 28-1 at 23).

[20] There is a reference to a video, but it is actually a screen shot of an email with an attachment, which is not accessible. (Doc. 39-20).

address whether Plaintiff has established a prima facie case. Accordingly, for purposes of this motion, the Court will assume that Plaintiff has satisfied her burden and will now determine whether Defendant had a legitimate, nonretaliatory reason for suspending Plaintiff.

Plaintiff states that because her complaints involved harassment, "she can go straight to the Chief, which she did," and that her "actions were consistent with the department and City sexual harassment policies." (Doc. 52 at 42-45).

The policy states in pertinent part:

RUSSELLVILLE POLICE DEPARTMENT –
SEXUAL HARASSMENT POLICY

***

I. PURPOSE - To establish policy prohibiting Sexual Harassment within the department.

***

   2.   While all forms of harassment are prohibited, it is the City's policy to emphasize that Sexual Harassment is specifically prohibited. Each City official has a responsibility to maintain the workplace free of any form of Sexual Harassment.

***

   5.   Any employee, male or female, who believes that the actions or words of a City Official or supervisor or fellow employee constitute unwelcome harassment has a responsibility to report or complain as soon as possible to his/her supervisor or to the Chief of Police if the complaint includes the employee's supervisor.

(Doc. 39-40). A plain reading of the policy at issue does not support Plaintiff's interpretation.

Defendant responds that Plaintiff's complaints did not involve complaints of a sexual nature and relies on the recording of her conversation with Chief Hargett in support. (Doc. 30, Ex. H).[21, 22] Plaintiff has not contested this evidence or cited any authority disputing Defendant's reason.

Furthermore, when asked if she went to see Chief Hargett to talk about sexual harassment, Plaintiff testified, "No. I never said anything about sexual harassment. I said that I went to the Chief of Police with my husband when he went to talk to the Chief, and also myself complained about harassment that I was facing." (Doc. 28-1 at 40).[23] Plaintiff also agreed that it would be a violation if the policy only related to harassment of a sexual nature and not general harassment. (*Id.* at 42). Having reviewed the evidence, the Court finds that Plaintiff has not shown that Defendant's reason for suspending her was a pretext for retaliation. Accordingly, summary judgment is granted on this claim.

---

[21] Defendant cites to *Nix v. WLCY Radio/Rahal Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984), for the proposition that an employer has a "right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." (Doc. 53 at 12, n.8).

[22] The recording of the meeting between Plaintiff and Mr. Gentry and Chief Hargett confirms that Plaintiff and Mr. Gentry confronted Chief Hargett about "harassment" by Sgt. Franks, with no mention of anything of a sexual nature. (Doc. 30, Ex. H).

[23] Plaintiff also testified, "It was actually my husband that said he wanted to speak with [Chief Hargett] about the harassment that Sergeant Franks had been doing over the weekend. I did not call the meeting. I did answer a few questions when Chief Hargett asked me direct questions." (Doc. 28-1 at 36-37).

6.   Doctor's excuse

Plaintiff claims that "on March 31 Chief [Hargett] [refused] [her] doctor's excuse" in retaliation for filing a charge of discrimination on March 24, 2016. (Doc. 52 at 40, 44).  Defendant asserts that Plaintiff's claim is "unsupported by the factual record," presumably arguing that the action never occurred.  (Doc. 53 at 12).

Plaintiff gave Chief Hargett a doctor's note requesting that she be placed in the office with day shift hours. (Doc. 39-43).  Chief Hargett requested clarification regarding the extent of her limitations.  (Docs. 28-2 at 35; Doc. 28-4 at 24, 39, 42).[24]  Plaintiff cites no evidence showing that Chief Hargett "refused" her doctor's note or suggesting that his request for clarification of her limitations was retaliatory.  (Doc. 52 at 40).[25]  Plaintiff fails to establish that the alleged conduct even occurred and, thus, cannot establish a materially adverse action.  Accordingly, summary judgment is granted on this claim.

7.   Donation of sick leave time

In connection with her March 24, 2016, charge of discrimination, Plaintiff asserts that on March 28, 2016, "no one from the police department is donating

---

[24] In response to Chief Hargett's request, Plaintiff's physician stated that Plaintiff could not wear her utility belt and could not be on the street because of the risk of an injury to her abdomen. (Doc. 28-4 at 42).

[25] Chief Hargett testified that he requested the additional information to make a determination about whether the department could accommodate Plaintiff.  (Doc. 28-4 at 39).

time." (Doc. 52 at 44). Defendant asserts that Plaintiff cannot establish a prima facie case because she has "zero evidence connecting [no donation of time] to any retaliatory motive or action by the City." (Doc. 53 at 13). Defendant's argument focuses on Plaintiff's lack of a causal connection.

Plaintiff obtained approval from Chief Hargett to request donations of sick leave and then emailed officers requesting donated leave. (Doc. 39-68; Doc. 28-1 at 87-89). She did not receive any donations from employees at the RPD. (Doc. 28-1 at 87-89).[26] City Clerk Joe Hamilton testified that sick leave donation is voluntary, and each employee makes the decision whether or not to donate sick leave. (Doc. 28-8, ¶ 4). Plaintiff testified that she "assumed" someone from the RPD directed employees not to donate leave, but she cites no evidence that Defendant was responsible for police officers not donating leave. (Doc. 28-1 at 65-66).[27] To the contrary, Chief Hargett testified that he "did not instruct any City employee to not donate sick leave to [Plaintiff]" and was not aware of any other City employee directing another employee not to donate leave. (Doc. 28-7, ¶ 8).

Plaintiff fails to establish a prima facie case because she cannot establish a causal connection. Accordingly, summary judgment is granted on this claim.

---

[26] Plaintiff received responses from three of the eight RPD employees she emailed. Those employees explained they could not donate time because they might need to use their sick leave. (Doc. 28-1 at 88-89).

[27] Plaintiff did receive donations of sick leave from the fire department where her husband worked. (Doc. 28-1 at 63).

8. <u>Calculation of donated sick leave</u>

Plaintiff asserts that she was retaliated against when "she was only given half of the hours donated to her." (Doc. 52 at 40). Defendant argues that "she presents no evidence to challenge the legitimate explanation regarding the calculation of her donated sick leave or any evidence that other employees received more favorable treatment." (Doc. 53 at 14). Thus, Defendant asserts that Plaintiff cannot establish an adverse action, and even if she could, Defendant had a legitimate, nonretaliatory reason.

Plaintiff relies on a recording of Mr. Gentry talking to City Councilman Arthur Elliot as factual support for her assertion. (Doc. 39-97). However, the Court finds no support for her assertion in this recording. City Clerk Hamilton, who processed the sick leave donations for Plaintiff, explained that "some donated leave is processed as a day-to-day exchange while other donations are processed as a straight hourly exchange," depending on the length of the employee's shift. (Doc. 28-8, ¶ 5).[28] City Clerk Hamilton processed sick leave that was donated to Plaintiff in this manner. (*Id.,* ¶ 6). City Clerk Hamilton testified that he made the same calculations he would make for other City employees and did not base his

---

[28] Mr. Hamilton explained: "If a firefighter works a 24-hour shift and donates sick leave to a police officer who works a 12-hour shift, the police officer will receive half of the donated time to match the police officer's shift time. If an employee with an 8-hour shift donates sick leave to an employee with a 12-hour shift, a straight hourly exchange is used because 8-hour and 12-hour shift employees work about the same number of hours in a two week period." (Doc. 28-8, ¶ 5).

calculations on Plaintiff's gender, pregnancy, or in retaliation for any complaints made by her. (*Id.,* ¶ 7).

Based on the evidence above, Plaintiff has failed to show that the way donated sick leave was calculated for her amounted to an adverse action. Thus, Plaintiff cannot establish a prima facie case. Accordingly, summary judgment is granted on this claim.

9.    Breastfeeding breaks

Plaintiff argues that "she was written up for pump/breastfeeding breaks." (Doc. 52 at 40). Specifically, she claims that on "November 7, [she] tells them she is breastfeeding, then on December 12 and 27 she is being counseled about her pump breaks." (*Id.* at 44). In response, Defendant argues that "[t]here is nothing materially adverse about the written counseling here because all it did was explain to [Plaintiff] how she should be handling her pumping breaks." (Doc. 53 at 15).

On December 12, 2016, Sgt. Miller completed a "Written Directive," informing Plaintiff that if she needed to take longer than her allotted one-hour break, the RPD would accommodate her, but she needed to let her supervisor know and make up the time at the end of her shift. (Doc. 39-55). Sgt. Miller also reminded Plaintiff to go "out of service" and "in service" from her car radio when she went on break. (*Id.*). No disciplinary action was taken against Plaintiff. On December 27, 2016, Sgt. Miller completed a "Counseling Form," reminding

Plaintiff to add additional time to the end of her shift if her breaks exceeded one hour. (Doc. 39-56).[29] No disciplinary action was taken.[30]

Plaintiff does not show that a materially adverse action occurred with respect to the written directive and counseling and thus cannot establish a prima facie case of retaliation. Assuming, *arguendo*, that Plaintiff could establish a prima facie case, Defendant has produced a legitimate, nonretaliatory reason for the counseling, *i.e.*, that the RPD must know "whether [Plaintiff] was available to take calls while on patrol, . . . make sure necessary shifts were covered without incurring too much overtime costs," and be able to "[e]xpect[] an employee to work an entire shift." (Doc. 53 at 15). Plaintiff has failed to show that Defendant's reasons are a pretext for retaliation. For the reasons discussed above, summary judgment is granted on this claim.

### 10. Docked pay for Mr. Gentry's presence in dispatch room

Plaintiff asserts that on June 18, 2016, "she was written up and docked 14 days' pay because her husband came to the department to bring her lunch." (Doc. 52 at 40; Doc. 39-51). Defendant argues that Plaintiff cannot "overcome the City's

---

[29] Although unrelated to breaks, Sgt. Miller also noted that Plaintiff had reported late for one shift and left early from four shifts, which was "unacceptable" and further violations would result in disciplinary action. (Doc. 39-56).

[30] Chief Hargett testified that a written directive gives an employee specific instructions and a counseling form is used to make an employee aware of behavior that needs to change. (Doc. 28-4 at 29).

showing that there was a legitimate reason for the June 18, 2016 discipline." (Doc. 53 at 17). Defendant does not address whether Plaintiff has established a prima facie case. Accordingly, for purposes of this motion, the Court will assume that Plaintiff has satisfied her burden and will determine whether Defendant had a legitimate, nonretaliatory reason to discipline Plaintiff.

First, Chief Hargett had instructed Plaintiff that Mr. Gentry could not come to the police station, even to have lunch with her, after the incident with the mayor. (Doc. 28-1 at 44; Doc. 28-3 at 36). Second, the dispatch room, where Plaintiff was working that day, contained computers with confidential information. (Doc. 28-1 at 43; Doc. 28-3 at 34-35).[31] RPD policy required that the dispatch room be secure to prevent unauthorized access. (*Id.*). Mr. Gentry did not have an official reason to be in the dispatch room. (Doc. 28-1 at 44; Doc. 28-3 at 350). Mr. Gentry's visit was personal --- to bring Plaintiff her lunch. (Doc. 28-1 at 44; Doc. 28-3 at 35). Plaintiff's argument --- that because Mr. Gentry worked in dispatch for the fire department, he was an "authorized person" --- is unpersuasive. (Doc. 52 at 45). Accordingly, Defendant has proffered a legitimate, nonretaliatory reason for disciplining Plaintiff.

---

[31] Plaintiff and Mr. Gentry testified that Plaintiff was offered the dispatch shift so she would not have to use her sick leave. (Doc. 28-1 at 43; Doc. 28-3 at 37).

Plaintiff argues that Defendant's reason is a pretext for retaliation because Mr. Gentry "was not in violation of policy as he was not in view of computers" and that "others were allowed to have their lunches brought to them while working dispatch." (Doc. 52 at 45). This argument is without merit as Plaintiff has failed to show that other employees' family members went in the dispatch room and were not disciplined. Plaintiff testified that she observed Patty Lumpkin's husband and father "[d]ropping off food" for Ms. Lumpkin when she was working in the dispatch room. (Doc. 28-1 at 67-68). However, there is no evidence that the family members went inside the dispatch room.

Chief Hargett testified that he was not aware of employees' family members being inside the dispatch room. He stated that he had seen spouses "bring food up there and stand out in the hallway at the window." (Doc. 28-4 at 27). There is no evidence that Chief Hargett had not disciplined other employees for the same violation committed by Mr. Gentry.[32] Plaintiff has failed to establish that Defendant's legitimate, nonretaliatory reason for disciplining her in this instance was a pretext for retaliation. Accordingly, summary judgment is granted on this claim.

---

[32] Chief Hargett also disciplined Sgt. Josh Thompkins for not reporting Mr. Gentry's presence in the dispatch room. (Doc. 28-4 at 26).

11.    <u>Turning in sick leave donation forms</u>

Plaintiff asserts that "she was written up . . . because her husband did not come to the department to turn in [donation] forms."  (Doc. 52 at 40).  Defendant argues that Plaintiff "was not disciplined or otherwise punished for her failure to follow instructions."  (Doc. 53 at 17).

Cpt. Prince verbally told Plaintiff to bring any sick leave donation forms to him, which she did for three months.  (Doc. 28-1 at 45; Doc. 39-52).  When the forms were later dropped off at City Hall, Cpt. Prince prepared a counseling form, reminding Plaintiff that the forms should be turned in to Chief Hargett. (Doc. 39-52).  Although Cpt. Prince noted that a recurrence would result in disciplinary action (*id.*), Plaintiff turned in leave donation forms to City Hall again, and Cpt. Prince prepared another counseling form.  (Doc. 28-2 at 50).  Cpt. Prince explained on the form that "[t]urning in your Sick Leave form to us helps us ensure that you are not short hours on your timesheet." (*Id.*).  Despite the previous warning, Plaintiff was not disciplined.  (*Id.*).

The two instances of counseling do not constitute discipline.  Accordingly, Plaintiff fails to show a materially adverse action in this instance and thus cannot establish a prima facie case.

Even if Plaintiff somehow could establish a prima facie case, Defendant asserts that it "had a legitimate, nonretaliatory reason for Captain Prince wanting to

receive the sick leave donation forms in order to keep track of [Plaintiff's] hours." (Doc. 53 at 17-18). Plaintiff presents no evidence that Defendant's legitimate, nonretaliatory reason for counseling her about her sick leave forms was a pretext for retaliation. Accordingly, summary judgment is granted on this claim.

12. <u>Failure to promote</u>

Even though Plaintiff asserts that she was retaliated against when "she was not promoted to Sergeant" (Doc. 52 at 40), she devotes no discussion whatsoever to this claim.[33] Accordingly, the Court considers this claim to be abandoned. *Smith v. Vestavia Hills Bd. of Educ.*, No. 16-842, 2018 WL 1408537, at *17 (Mar. 21, 2018) (citing *Brackin v. Anson*, 585 F. App'x. 991, 994 (11th Cir. 2014) ("The parties bear the burden of formulating arguments before the district court, and 'grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned' and will not be considered on appeal.")).[34] As such, summary judgment is granted with respect to this claim.

13. <u>Termination/Resignation</u>

Plaintiff asserts that she was retaliated against when "she was involuntarily terminated." (Doc. 52 at 40). Defendant argues that Plaintiff cannot establish a

---

[33] Defendant asserts that Plaintiff never raised a lack of promotion claim during her deposition. (Doc. 53 at 18).

[34] Accordingly, the Court does not address Defendant's argument that Plaintiff did not exhaust her administrative remedies. (Doc. 53 at 18).

prima facie case of retaliation because she cannot show that she suffered a materially adverse action since she voluntarily resigned. (Doc. 53 at 19).

Plaintiff argues that her resignation was not voluntary and relies on *Rodriguez v. City of Doral*, 863 F.3d 1343 (11th Cir. 2017), in support. (Doc. 52 at 52). In *Rodgriguez*, the Eleventh Circuit noted that a resignation is voluntary unless the employee can establish that the resignation was (1) forced by coercion or duress or (2) was obtained by deceiving or misrepresenting a material fact. *Id.* at 1352. Plaintiff relies on the first of these means to establish that her resignation was not voluntary.

In analyzing a claim of coercion or duress, the Eleventh Circuit noted that it must consider the "totality of the circumstances" and identified a non-exhaustive list of five factors to guide the analysis:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.

*Rodriguez,* 863 F.3d at 1352 (citing *Hargray v. City of Hallandale,* 57 F.3d 1560, 1568 (11th Cir. 1995)).

The *Rodriguez* Court noted that the first factor focuses on an analysis of whether the employee had any "real alternatives," which is determined by an objective standard. *Id.* "[T]he other enumerated factors bear on the assessment of

whether an alternative qualifies as a 'real alternative.'" *Id.* Even if the alternative is "'comparatively unpleasant' to termination," that does not necessarily mean that the resignation is not a "real alternative." *Id.*

The Eleventh Circuit has recognized that "resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause . . . ." *Id*; *see also Jones v Allstate Ins. Co.,* 707 F. App'x. 641, 646 (11th Cir. 2017) (stating that "Plaintiff's decision to voluntarily resign in the face of a possible termination is not a constructive discharge," and thus, Plaintiff failed to establish an adverse action as part of her retaliation claims brought under the ADA, FMLA, and Title VII). However, the "one exception to this rule is where the employer actually lacked good cause to believe that grounds for the termination . . . existed." *Hargray*, 57 F.3d at 1568.

The record in this case supports Defendant's contention that Plaintiff was provided with a real alternative to resignation and understood the nature of her choices. As an initial matter, the Court notes that the record includes the audio recording of the meeting between Chief Hargett and Plaintiff. (Doc. 39-79). The meeting lasted about 20 to 25 minutes. *(Id.)*. Chief Hargett started the meeting by informing Plaintiff that she had violated the chain of command again and that he had previously told her that a reoccurrence would result in disciplinary action. *(Id.)*. Chief Hargett then told her that he was treating her like everyone else and

giving her the opportunity to resign, so she is "leaving on her own free will" and will not be terminated. (Doc. 39-79; Doc. 28-1 at 57). Plaintiff responded that if she had a choice between resigning and being terminated, she would rather resign. (Doc. 39-79).[35] Chief Hargett reiterated that he always tries to give people the opportunity to resign because it looks better than a termination when they are trying to get another job. (*Id.*).

Plaintiff asked whether she should turn in a resignation letter that afternoon. Chief Hargett responded that the resignation would be effective immediately. (Doc. 39-79). Plaintiff responded again that she wanted to write a letter, and Chief Hargett told her that was fine "if that's what she wanted to do." (*Id.*). She asked if she should type it and bring it back, and he said she could write it at the office "if you want." (*Id.*). Parts of the recording are inaudible, but according to Plaintiff's testimony, Chief Hargett told her that there was a computer in the room and that she was "welcome to use the supervisor computer." (*Id.*; Doc. 28-1 at 58). Chief Hargett did not stay in the room while Plaintiff wrote her resignation letter. (Doc. 28-1 at 61).

Based on the evidence, Plaintiff had advance notice of her impending termination. The day after the City Council meeting in which Plaintiff voiced her

---

[35] Several months later, Plaintiff testified that she appreciated the opportunity to resign as opposed to being terminated and that she would still choose resignation over termination. (Doc. 28-1 at 60-61).

complaints, she reported to work.  (Doc. 28-1 at 55).  But Chief Hargett sent her home early, informing her that she was being "placed on administrative leave based on [her] going to the Council meeting." (*Id.*)  The next day, while Plaintiff was in Birmingham with her father, the RPD called Plaintiff and told her to come to the station to meet with Chief Hargett and to bring all of her equipment and materials.  (*Id.* at 56).  Plaintiff acknowledged that she "assume[d] since I had to bring in all of my equipment, that I was being fired." (*Id.*).  Plaintiff had at least two hours between the phone call and arriving at the station.  (*Id.*).[36]  Plaintiff told her father about the phone call and told him that she thought she was going to be terminated.  (*Id.*).  Plaintiff could have called her counsel during this time but did not.[37]  When asked whether she was considering trying to resign before being terminated, Plaintiff testified that she "went into the meeting just with an open mind . . . figuring [she] was being fired, but [] wasn't 100 percent."  (Doc. 28-1 at 56).  Clearly, Plaintiff had some knowledge of what was about to happen and some time to contemplate the situation.  *See Hargray,* 57 F.3d at 1569 (recognizing that the plaintiff had advance notice of the charges against him).

---

[36] Plaintiff testified that she had to drive from Birmingham to Russellville, drop off her father, go home to get her equipment, and then go to the station.  (Doc. 28-1 at 56).

[37] Defendant points out that Plaintiff was already represented by counsel with respect to her EEOC and lawsuit filings and that her counsel is located in Birmingham, where Plaintiff was at the time she received the phone call from the RPD.  (Doc. 50 at 34; Doc. 53 at 19).

While it is true that Plaintiff was not permitted to select the effective date of resignation and did not have the advice of counsel during the meeting, the circumstances under which Plaintiff signed her resignation were not coercive. The recording indicates that the tone and environment of the meeting was relaxed. Plaintiff implies that somehow pressure was exerted because "[t]hey even held the baby while she typed [her resignation] up on their computer." (Doc. 52 at 52). However, the recording reveals friendly conversation between Plaintiff and her co-worker about the baby while Plaintiff typed her resignation. (Doc. 39-79). Furthermore, Plaintiff testified that there was nothing coercive or threatening about the situation. (Doc. 28-1 at 59-60). *See Hargray*, 57 F.3d at 1570 (transcript revealed that "interview was conducted under a casual atmosphere, during which [Plaintiff] at times even laughed with the police").

The *Hargray* Court also recognized that "cases finding a resignation to be involuntary based on coercion or duress involve circumstances much more coercive than those in the instant case." *Hargray*, 57 F.3d at 1570. Those cases involved situations in which the employee's repeated requests for additional time and to speak to counsel were ignored, the employee was not informed of the charges or grounds for termination, and threatening tactics were used. The facts in *Rodriguez* are also inapposite to the facts in the instant case. In *Rodriguez*, the employer refused to tell the plaintiff why he was being fired, the plaintiff only

learned of his termination at the moment he received his letter of termination, the employer refused to give him a reason for his termination, the plaintiff had five minutes to agree to submit his resignation, and the resignation letter was written by the employer, not the plaintiff. 863 F.3d at 1353-54.[38] In the instant case, Plaintiff did not ask for additional time, did not request to speak to counsel, knew the grounds for her termination, and wrote her own resignation letter. (Doc. 39-79).

Finally, Defendant had good cause to believe it had grounds to terminate Plaintiff. Defendant told Plaintiff she had violated the chain of command again. Rather than speak to Chief Hargett about the temporary schedule change to night shift (which had not yet been implemented), Plaintiff decided to go to City Council without telling anyone at the RPD. (Doc. 28-1 at 46, 52). Plaintiff also misled the City Council to believe she had been required to undertake the assignment guarding the inmate at Huntsville Hospital ,which did not occur. (Doc. 28-1 at 47-48; Doc. 28-4 at 30, 32, 34; Doc. 28-6 at 4). Thus, this case does not fall into the "one exception to this rule [] where the employer actually lacked good cause to believe that grounds for the termination . . . existed." *Hargray*, 57 F.3d at 1568.

Based on the evidence in this case and authority discussed above, the Court finds that Plaintiff has not overcome the presumption that her resignation was

---

[38] The court ultimately found a coercive atmosphere existed, and thus, the plaintiff's resignation was not voluntary. *Rodriguez,* 863 F.3d at 1354.

voluntary.  Plaintiff fails to prove an adverse action, necessary to establish a prima facie case.  Accordingly, the Court grants summary judgment on this claim.

## B.  Gender Discrimination Claims

Plaintiff asserts claims of gender discrimination under Title VII and Section 1983.  Discrimination claims under both statutes are analyzed under the same legal framework.  *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).  Discrimination claims can be established based on direct or circumstantial evidence.  *Id.*  Plaintiff has not produced direct evidence of gender discrimination, relying instead on circumstantial evidence.  Thus, Defendants assert that the burden-shifting analysis set forth in *McDonnell Douglas,* 411 U.S. at 803, applies to Plaintiff's claims.

Plaintiff, on the other hand, argues that she does not have to adhere to a strict *McDonnell Douglas* framework and that the "appropriate framework for examining mixed motive claims" is the standard set forth in *Quigg*, 814 F.3d at 1232-33.  (Doc. 52 at 46).  Under *Quigg,* a plaintiff need only offer "'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action.'" *Id.* at 1239 (citation omitted).  "In other words, the court must determine whether the 'plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance

of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision.'" *Id.*

Defendant argues that Plaintiff asserts a mixed-motive theory for the first time in her summary judgment response, in contrast with her complaints and overall argument which focus on a single-motive theory. (Doc. 53 at 21). The Eleventh Circuit held that "a plaintiff should not be required to label her complaint 'as either a 'pretext' case or a 'mixed motives' case' . . . 'because '[d]iscovery often will be necessary before the plaintiff can know whether both legitimate and illegitimate considerations played a part in the decision against her'." *Babb v. Sec'y. Dep't of Veterans Affairs*, 743 F. App'x 280, 286-87 (11th Cir. 2018) (citations omitted). The *Babb* Court held that the plaintiff "sufficiently raised her mixed-motive theory . . . by arguing it in response to the [defendant's] summary judgment motion." *Id.* at 287. Accordingly, the Court applies the *Quigg* mixed-motive framework to Plaintiff's discrimination claims of demotion, disparate treatment, and constructive discharge.

1. Demotion

Plaintiff alleges a discriminatory demotion on the basis of gender in violation of Title VII (Doc. 1, ¶ 16, No. 3:16-cv-01466). Defendant does not dispute that Plaintiff's demotion constitutes an adverse employment action.

The Court turns to the second factor. To show gender was a motivating factor, Plaintiff argues that "Chief [Hargett] and [Cpt.] Prince told [her] in the beginning they were going to do thing [sic] differently with her," requiring her to go through training, and telling her "'it's not because you are female.'" (Doc. 52 at 47; Doc. 28-1 at 29, 74; Doc. 39-17, part 2 recording). Although Plaintiff agrees that there should be a training program for new supervisors and officers, she objects to being the first officer to go through supervisor training. (Doc. 28-1 at 24). She complains that no sergeants before her were subject to the same supervisor training. The facts show that the RPD previously did not require either men or women to undergo a training program. Furthermore, that group of sergeants, who did not go through training, were not all male; the group included a female sergeant, Linda Michaels. (Doc. 28-4 at 7).[39] Thus, it was not only males who were spared the training program.

Furthermore, Chief Hargett and Cpt. Prince explained that the training program was being implemented for *all* officers and that someone had to be the first officer to go through the program. (Doc. 53 at 23-24; Doc. 39-17, part 2 recording). Chief Hargett and Cpt. Prince stated that although she was the first, it

---

[39] Ms. Michaels was promoted to sergeant prior to Chief Hargett's hiring at the RPD, and served as sergeant for approximately ten years. (Doc. 28-4 at 7).

had nothing to do with her being female, or white, or because she had red hair. (*Id.*).

Plaintiff also argues that Defendant "backdated the [training] policy to appear it was in effect before her demotion, then removed the day when producing it in this lawsuit so [Plaintiff] would not be able to establish it was enacted after her demotion." (Doc. 52 at 50- 51). Cpt. Prince testified that he did not backdate the policy, the department had been working on the policy for some time, and the policy was published for employees to see on October 29, 2015. (Doc. 28-5 at 18-19). The RPD implemented the training program "to compensate for the relative inexperience of officers, including [Plaintiff], who would hold supervisory positions." (Doc. 53 at 23; Doc. 39-17, part 2 recording). The parties do not dispute that the RPD required "every officer promoted to sergeant since [Plaintiff] . . . to successfully complete the program." (Doc. 50 at 8, ¶ 14; Doc. 52 at 6, ¶ 14). These officers included males and a female. (Doc. 50 at 8, ¶ 14; Doc. 52 at 6, ¶ 14; Doc. 28-1 at 30). Plaintiff agreed that whether the new supervisor training policy was officially published or not, failing to successfully complete the training would be a valid reason to demote her. (Doc. 28-1 at 31). Accordingly, Plaintiff's conclusory arguments, without more, are without merit.

Plaintiff also argues that because her last evaluation prior to her promotion to sergeant was "glowing and contradicted everything in the field training

evaluations," she was "qualified for the position." (Doc. 52 at 48). However, even if Plaintiff's evaluation as a patrol officer was "glowing," it is irrelevant in determining her performance as a sergeant. The field training evaluations measured her abilities as a sergeant, and these evaluations reflected Plaintiff's failure to exhibit command presence and control situations, difficulty organizing officers and distributing calls, unfamiliarity with policies and procedures, sleeping on duty, and insubordination. (Doc. 28-1 at 19-20, 120-26). The Court has already addressed above the issue of sleeping in a patrol car while on duty. As for insubordination, Plaintiff merely responds that "[s]he was criticized for explaining her actions and trying to engage with her superiors." (Doc. 52 at 50). She also asserts that Defendant did not sit down with her daily and give her the opportunity to correct criticisms. (*Id.*). However, Chief Hargett made clear to Plaintiff during their meeting that he had instructed the field training officers to review Plaintiff's performance with her at the end of each shift. (Doc. 39-20). Plaintiff has either admitted some of her deficiencies or failed in large part to dispute the shortcomings reflected in her evaluations.[40]

Finally, when Plaintiff was asked, "having you go through that training had nothing to do with your gender, correct?" Plaintiff replied, "No." (*Id.*).

---

[40] Although Plaintiff argues that she had just as many years of experience as Sgts. Miller and Franks, she fails to establish that Sgts. Miller and Franks had similar issues in their evaluations as sergeants. (Doc. 52 at 48).

Accordingly, Plaintiff fails to show by a preponderance of the evidence that her gender was a motivating factor in the decision to demote her. Thus, the Court grants summary judgment on Plaintiff's demotion claim.

### 2. Disparate Treatment

Plaintiff alleges disparate treatment in violation of 42 U.S.C. § 1983. (Doc. 1, ¶¶ 159-63, No. 3:17-cv-01127). Specifically, she argues that she received discriminatory assignments and discipline. (Doc. 52 at 48).

Regarding discriminatory assignments, Plaintiff asserts that the RPD scheduled her to guard an inmate overnight in Huntsville (*id.*) and she did "not hav[e] the option or the accommodation of how [she] was supposed to express milk or have [her] child brought up to [her] to the hospital without being able to turn [her] back on the suspect." (Doc. 28-1 at 47). Defendant, however, reassigned Plaintiff to a night shift in Russellville. (*Id.*).[41] Accordingly, Plaintiff fails to show that the action even occurred.

Plaintiff asserts that her reassignment to a night shift in Russellville was discriminatory because a "rookie male was assigned to day shift." (Doc. 52 at 49).

---

[41] Plaintiff complains that she was "forced to haggle with her supervisors for several hours trying to resolve the breastfeeding issue." (Doc. 52 at 49). However, Plaintiff agreed that the situation, resulting from a shooting in Russellville, was unusual. (Doc. 28-1 at 47). Plaintiff complains that she was working the 6:00 am to 6:00 pm shift when the decision was made to reassign her to night shift. (Doc. 52 at 49). Even though she went home at 10:00 am that day, she complains that she had very little time in between her day shift and night shift, which violated policy. (*Id.*). Plaintiff does not refer to the policy at issue and does not explain how the reassignment to night shift differed from her original assignment to guard the inmate "overnight." (*Id.*).

Claims involving reassignments are "especially important" because in most cases, "an employee alleging a change in work assignments, without any tangible harm, will be outside the protection provided by Title VII's anti-discrimination clause." *Hall v. Dekalb Cty. Gov't,* 503 F. App'x 781, 787 (11th Cir. 2013) (citation omitted). The Court does not "sit as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of [the defendant's] business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez v. Royal Atl. Developers,* 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Chapman v. A1 Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)).

Cpt. Prince explained to Plaintiff that the reassignment to night shift was temporary until new supervisors gained more experience. (Doc. 30, Ex. L, recording). Male officers were also reassigned to night shifts. (*Id.*). Cpt. Prince also explained to Plaintiff that she and Officer Josh Thompkins could not be on the same shift because they both had the most disciplinary problems. (*Id.*). It is undisputed that Plaintiff left the RPD before the temporary reassignment actually took effect. Based on this evidence, not only does Plaintiff fail to establish an adverse action, she also cannot show that gender motivated the RPD to place her on the night shift. Accordingly, Plaintiff's claim of disparate treatment in this instance is without merit.

As for discriminatory discipline, Plaintiff argues that "[s]he was docked pay for sleeping on the job. Everyone slept on the job. There is no evidence of anyone else being written up for sleeping on the job." (Doc. 52 at 51). She also argues that "[s]he was docked pay and terminated for violating the chain of command when clearly she did not violations [sic] of the chain of command as her complaints of discrimination were governed by a different policy." (*Id.*).

The Court discussed both of these allegations above under Plaintiff's retaliation claim, using the burden-shifting framework of *McDonnell Douglas*. Under a mixed-motive theory, Plaintiff has met her burden of establishing an adverse employment action as she suffered a loss in pay with respect to both disciplinary actions.

However, Plaintiff's assertion that everyone slept on the job but was not disciplined is inaccurate. Plaintiff identified one officer, Lt. Shackelford, who was asleep at his desk, but she provides no evidence that Chief Hargett was aware of the incident and failed to discipline him. Furthermore, Plaintiff fails to acknowledge that Lt. Shackelford was in the police station and not in his patrol car at the time of the incident. *See infra*, at 20-21. As to the second allegation of discipline, Plaintiff's assertion that her complaints were governed by a "different" policy --- and, therefore, she did not violate the chain of command --- is simply

erroneous.  *See supra*, at 21-23.  Accordingly, Plaintiff cannot show that her gender was a motivating factor in Defendant's decision to discipline her.

Plaintiff also raises the issue of being "treated different from similarly [sic] males who had been promoted." (Doc. 52 at 47).  This different treatment includes not being "moved from patrol to Sergeant in the system," being placed on a one year probation instead of six months,[42] and not being given a GPS and access to log in to correct reports.  (*Id.* at 50).  She also asserts that she was not allowed to take extra breaks for a drink or snack, drive her children in her police vehicle, permit her husband to bring her food in dispatch, and "given the full hours as male officers were." (*Id.* at 48).

Some of these incidents have been addressed above.  As to the other incidents, Plaintiff has not shown that they rise to the level of an adverse employment action, *i.e.*, "a serious and material change in the terms, conditions, or privileges of employment." *Howard,* 605 F.3d at 1245 (citation omitted).  Finally, this evidence, even accepted as true, simply does not amount to "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [gender] was a motivating factor" (*Quigg,* 814 F.3d at 1239) in Defendant's decision to demote her.  Accordingly, the Court grants summary judgment on these claims.

---

[42]  Plaintiff was demoted after three months.  (Doc. 39-22).

### 3. Constructive Discharge

Plaintiff alleges a discriminatory discharge claim in violation of Title VII. (Doc. 1, ¶¶ 146-51, No. 3:17-cv-1127). As noted above under the Court's discussion of retaliation, Plaintiff cannot establish that she suffered an adverse employment action because she voluntarily resigned from her position. Accordingly, summary judgment is granted on this claim.

### 4. Hostile Work Environment

Plaintiff alleges a hostile work environment claim on the basis of gender discrimination under Title VII and 42 U.S.C. § 1983. (Doc. 1, ¶ 15, No. 3:16-cv-1466; Doc. 1, ¶¶ 164-69, No. 3:17-cv-1127). To establish a hostile work environment claim, Plaintiff must show: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her gender; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of her employment and create a hostile or abusive working environment; and (5) that the employer is liable. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).[43]

A violation occurs when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter

___

[43] In *Cross v. State of Ala., State Dep't. of Mental Health & Mental Retardation,* the Eleventh Circuit noted that "[w]hen section 1983 is used as a parallel remedy for violation of section 703 of Title VII, the elements of the two causes of action are the same." 49 F.3d 1490, 1508 (11th Cir. 1995) (citations omitted); *see also Watkins v. Bowden*, 105 F.3d 1344, 1355 (11th Cir. 1997) (addressing elements of a hostile work environment claim under the Equal Protection Clause).

the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). In evaluating the sufficiency of the severe or pervasive aspect of the conduct, the Court must consider subjective and objective components. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). Four factors should be considered in analyzing whether the conduct objectively altered the conditions of the employee's employment:

> (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.

*Id.* Furthermore, "courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Id.*

Plaintiff devotes over two pages to the legal standard and case law to apply to her hostile work environment claims. However, she states in a single sentence that "[t]he defendant's conduct argued in Subsections I, II, III and IV was so severe and pervasive it materially altered [her] job." (Doc. 52 at 56). The totality of the conduct identified by Plaintiff and discussed above was not sufficiently severe or pervasive enough to alter her employment and create a hostile or abusive workplace. *See McQueen v. Ala. Dep't. of Transp.*, No. 17-13405, 2019 WL

1773270, at *4 (11th Cir. Apr. 23, 2019) (finding that the "mistreatment considered cumulatively was too sporadic and isolated to be considered pervasive").  Also, there are no allegations of sexual harassment, and none of the conduct she complains about was physically threatening or humiliating or unreasonably interfering with her job performance.  Plaintiff has failed to create a genuine issue of material fact with regard to her hostile work environment claim.

## C.    Fair Labor Standards Act Claim

Plaintiff alleges that Defendant violated her rights under the Fair Labor Standards Act (FLSA) with respect to expressing milk and breastfeeding.  (Doc. 1, ¶ 152-58, No. 3:17-cv-01127).  The FLSA states in pertinent part that employers shall provide:

(A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and

(B) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

29 U.S.C. § 207(r)(1).

Plaintiff argues that she was not provided a private room to express breast milk and had to go home. (Doc. 52 at 53-54).  Defendant asserts that it did provide Plaintiff with a private room--the break room.  (Doc. 53 at 4).  Plaintiff does not dispute the fact that the break room had a door that could be locked from the inside

(Doc. 28-1 at 50; Doc. 28-5 at 20). Plaintiff argues that the room was not private because Chief Hargett and Cpt. Price had a key to the break room. (Doc. 52 at 53).[44] Plaintiff does not cite any authority for the proposition that supervisors having keys to the provided place violates 29 U.S.C. § 207(r)(1). The Court finds that the Chief and Captain's possession of keys to the break room does not violate Section 207(r)(1)(B).

Plaintiff acknowledges that she had the option to go home to express breast milk. (Doc. 28-1 at 50-51). Plaintiff testified that she took two to three breaks during each shift. (*Id.* at 50). Because her breaks exceeded 60 minutes, which was her total allotted break time, she was counseled and required to make up any excessive time at the end of her shift. (Doc. 28-1 at 82, 96; Doc. 28-5 at 21-22; Doc. 39-55; Doc. 39-56).[45] Plaintiff has not shown that her break time to express milk was unreasonable under the FLSA. Accordingly, the Court finds that there is

---

[44] Plaintiff asserts that the break room "was cleaned by inmates." (Doc. 53 at 53). She does not explain how this disrupts the privacy of the break room since the break room had a door which could be locked from the inside. (Doc. 28-1 at 50; Doc. 28-5 at 20).

[45] Plaintiff asserts that counseling and write ups for breaks exceeding 60 minutes were used in disciplinary decisions, including her termination. (Doc. 52 at 54). Even if true, Plaintiff has not shown how this is a "compensable loss" under the FLSA. *See Hicks v. City of Tuscaloosa*, No. 13-02063, 2015 WL 6123209, at *29 (N.D. Ala. Oct. 19, 2015) (granting summary judgment on FLSA claim for lost pay and constructive discharge related to nursing breaks because plaintiff was unable to show that this was a "compensable loss" under the FLSA).

no genuine issue of material fact as to Plaintiff's FLSA claim, and summary judgment is due to be granted.[46]

## IV.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendant's motion for summary judgment with respect to Plaintiff's Title VII retaliation claims.  The Court **GRANTS** Defendant's motion with respect to Plaintiff's Title VII and Section 1983 gender discrimination claims.  The Court **GRANTS** Defendant's motion with respect to Plaintiff's FLSA claim.

**DONE** and **ORDERED** August 29, 2019.

_____

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

---

[46] Because the Court finds that Plaintiff has not established a genuine issue of material fact as to being offered a place and reasonable time to express breast milk, the Court need not address Defendant's argument that "the FLSA does not provide a private right of action under the circumstances asserted in [Plaintiff's] complaint."  (Doc. 53 at 4).  *See Miller v. Roche Sur. & Cas. Co., Inc.*, 502 F. App'x 891, 893 (11th Cir. 2012) ([B]ecause [defendant] did not violate [section 207(r)(1)], we need not decide the issue of damages.").